UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CONEISHA SHERROD, | § | |
| | § | |
| *Plaintiff*, | § | Civil Action 4:24-cv-628 |
| | § | |
| vs. | § | **JURY DEMANDED** |
| | § | |
| WALLBOX USA, INC., | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE COURT:

Plaintiff Coneisha Sherrod presents their Complaint for unlawful discrimination, retaliation, and hostile work environment against Wallbox USA, Inc. ("Wallbox") for

**JURISDICTION AND VENUE**

1.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331.

2.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §§ 1391(b) and (c) because the parties reside in this judicial district and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**PARTIES**

3.     Ms. Sherrod is an individual residing in this judicial district.

4.     Wallbox is a foreign corporation who may be served with process by serving its registered agent, Corporation Service Company dba CSC – Lawyers Incorporating Service Company, at its registered address, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

**FACTUAL ALLEGATIONS**

**Race Discrimination and Retaliation**

5.      Wallbox is a subsidiary of a global company from Spain.

6.      Wallbox manufactures vehicle charging systems.

7.      Wallbox has a facility in Arlington, Texas.

8.      Wallbox hired Ms. Sherrod as an employee on August 25, 2022.

9.      Wallbox hired Ms. Sherrod as its Sr. People and Talent Partner– North America.

10.     At Wallbox, People and Talent is another way of saying Human Resources.

11.     Ms. Sherrod is an African American (Black).

12.     Ms. Sherrod is a human resource expert who regularly testifies on human resource standards.

13.     Ms. Sherrod informed Wallbox before being hired that she would have to testify in a court case in October 2023, in Houston, Texas.

14.     At Wallbox, Ms. Sherrod reported to Angela Smith (Biracial), the Director of People and Talent, North America.

15.     Wallbox's Chief People Officer is Leo Altamira, whose office is in Barcelona, Spain.

16.     Mark Flynn (White) is the Plant Director in Arlington, Texas.

17.     Ms. Smith was absent from Wallbox's office for about a month after Wallbox hired Ms. Sherrod.

18.     Wallbox was in a startup mode at its facility in Texas, with limited desks and equipment.

19.    Ms. Smith had limited contact with Sherrod during the first month and gave limited direction.

20.    Wallbox had limited, if any, standard operating procedures.

21.    Wallbox did not have written policies in place, including employment policies, except for policies from a third-party PEO contractor.

22.    Wallbox needed about 15 to 20 contract staff to work on production beginning October 3, 2022.

23.    Wallbox directed Ms. Sherrod to find the workers, although recruiting was not within her job description.

24.    Ms. Sherrod found the necessary workers on short notice.

25.    The contract workers were mostly Hispanic and African American.

26.    Wallbox instructed that the contract workers were to begin working on the first shift on October 3, 2022, a Monday.

27.    On the Friday before, September 30, 2022, after office hours, Robert Craft, the Operations Director, instructed Ms. Sherrod to contact the staffing company to have one-half of the workers to start on the second shift beginning that Monday.

28.    Ms. Sherrod expressed concern to Ms. Smith about disrupting the plans of the persons hired on short notice over the weekend.

29.    Ms. Smith instructed Ms. Sherrod to email Craft, expressing concerns for the workers and noting that the staffing company was closed, making it difficult to contact them, that the workers could possibly be inconvenienced with the short notice, and should be informed about any changes on Monday.

30.     Mr. Flynn informed Ms. Smith that he did not like the tone of the email and that he wanted to fire Ms. Sherrod.

31.     Ms. Smith defended Ms. Sherrod without telling Mr. Flynn that she instructed Ms. Sherrod to send the email. Despite sending the email at Ms. Smith's instruction, Ms. Smith suggested Ms. Sherrod apologize to Mr. Flynn and Mr. Craft.

32.     This was the beginning of Ms. Sherrod's concern about Wallbox's discrimination against her and other minorities.

33.     Up to that time, Wallbox had assigned Ms. Sherrod a workplace, not at the plant, but up the street at Nuvodesk, an outside co-working space company.

34.     Around the first of October 2022, Mr. Flynn demanded that Ms. Sherrod move her workspace from Nuvodesk to the plant.

35.     Ms. Sherrod complied, but when she brought her office items, computer desk, and equipment to the plant, Mr. Flynn said Wallbox did not have the space for her and to move back to Nuvodesk.

36.     Ms. Sherrod again complied.

37.     A few days later, Mr. Flynn instructed her to again to move to the plant.

38.     Wallbox set up Ms. Sherrod with a desk in an open area without walls, an environment with construction noise and other close conversations, not a place conducive for office work.

39.     On October 13, 2022, Ms. Sherrod messaged Ms. Smith through Slack that she had to appear in court the following week in Houston to testify as an expert witness.

40.     About this time, Ms. Smith had lunch with Sharmone Johnson (Black) and LaKreece Allen (Black).

41.     Ms. Johnson is the EHS (Environmental Health Safety) specialist, responsible for safety.

42.     Ms. Allen is the Finance Manager.

43.     Ms. Johnson told Ms. Sherrod that Ms. Smith said she had googled Ms. Sherrod and discovered that Ms. Sherrod had obtained a verdict against a previous employer.

44.     Ms. Johnson told Ms. Sherrod that she was uncomfortable by the way Ms. Sherrod was being discussed by Ms. Smith and Ms. Allen.

45.     In the next several conversations with Ms. Sherrod, Ms. Smith prefaced her comments sarcastically by saying, "I'm not an expert, but . . ."

46.     This concerned Ms. Sherrod.

47.     On October 25, 2022, Ms. Smith requested Ms. Sherrod's assistance in writing a demand letter concerning her son who had been fired from his employer.

48.     Ms. Sherrod suggested seeking legal counsel and agreed to proofread the document.

49.     Ms. Sherrod could not think of a reason why Ms. Smith asked her for help with this task considering other employees were also present. Later Ms. Smith accused Ms. Sherrod of not doing her work.

50.     On October 27, 2022, Ms. Smith had a confrontation on the plant floor with Charlene Yeldon (Black).

51.     Ms. Yeldon confided in Ms. Smith about another employee, Montrell McDonald (Black), being hostile and harassing towards her.

52.     The discussion about this matter between Ms. Smith and Ms. Yeldon became heated.

53.     Ray Thomas (Black), a witness to the incident, had to step in between them to deescalate the situation.

54.     Groups of employees talked about the incident and how inappropriate it was, and that it was just short of a physical fight.

55.     On that day, October 27, 2022, Mr. Thomas told Ms. Sherrod about the fight. Ms. Sherrod was shocked.

56.     Ms. Johnson and Curt Landers, the Director of Operations (White), confirmed the incident occurred.

57.     Ms. Sherrod reached out to Ms. Yeldon and asked if she was alright.

58.     Ms. Yeldon was upset and said that she came up to the front and saw Ms. Smith in the break area.

59.     Ms. Yeldon then reported to Ms. Smith that Mr. McDonald did not like following her instructions, yelled, cursed, threw things, and waived his hands in her face repeatedly.

60.     Ms. Yeldon said that she told Ms. Smith she was sick of the treatment by Mr. McDonald.

61.     Ms. Yeldon told Ms. Sherrod that Ms. Smith responded, "You knew what you signed up for in a male dominated industry and you need to just take it." Ms. Sherrod said that is not okay.

62.     Because she was upset and Wallbox was in the middle of a Grand Opening, Ms. Yeldon said that she would talk to Ms. Sherrod more about it later.

63.    Ms. Sherrod said that if Ms. Yeldon wanted to make a complaint, she needed to give Ms. Sherrod a written statement.

64.    Ms. Yeldon said that she would think about whether she wanted to make a written complaint.

65.    A few days later, Ms. Sherrod followed up with Ms. Yeldon to see if she was okay and see if she wanted to make a written complaint.

66.    Ms. Yeldon responded that she did not want to make a formal complaint because she was concerned about retaliation.

67.    Ms. Yeldon said that if anything else happens with Mr. McDonald, she would come to Ms. Sherrod instead of Ms. Smith because she did not want to have any other dealings with Ms. Smith.

68.    On October 31, 2022, Ms. Smith discussed her son's situation again with Ms. Sherrod.

69.    Ms. Smith said that her son's employer asked what she wanted and asked Ms. Sherrod's opinion on what to do. Ms. Sherrod was not comfortable with the discussion.

70.    Ms. Sherrod got the impression that Ms. Smith knew about Ms. Sherrod's own situation with a lawsuit.

71.    Ms. Sherrod helped Ms. Smith again with her son. Ms. Smith thanked her.

72.    At this time, Ms. Smith had not expressed any complaints or concerns about Ms. Sherrod's work performance.

73.    On November 1, 2022, Ms. Sherrod and Ms. Smith were sitting at the table where they worked.

74.    Ms. Sherrod advised Ms. Smith that she was having difficulty working and concentrating with the noise, people traffic, and lack of security for her and the information for which Ms. Sherrod was responsible.

75.    Ms. Smith said that there was nothing that she could do.

76.    Ms. Sherrod suggested doing more work from home or from Nuvodesk, but Ms. Smith rejected these suggestions, stating Ms. Sherrod needed to be at the plant daily.

77.    On November 2, 2022, a cleaning person named Ethel, a Hispanic female, complained that she was being sexually harassed by John Taylor, a white male.

78.    Ethel was a contract employee of CBRE, a corporation that Wallbox hired to manage the maintenance of the plant property.

79.    Ethel made the complaint to Ms. Sherrod with the help of a co-worker translating her statements from Spanish to English.

80.    Ethel said Mr. Taylor had repeatedly asked her personally and on her personal phone to come to his house to clean.

81.    Ethel repeatedly refused.

82.    Ethel's refusals did not stop the requests which became harassing.

83.    This was even more concerning because Mr. Taylor was responsible for supervising her, having the responsibility to oversee all the CBRE employees.

84.    When she refused, Mr. Taylor made her work conditions worse, such as making her eat lunch in the closet without access to drinks or snacks.

85.    Lisa Cutler, a receptionist contracted through CBRE, informed Ms. Sherrod that she had already informed HR at CBRE about Mr. Taylor sexually harassing Ethel.

86.     Ms. Cutler identified for Ms. Sherrod the HR representative at CBRE.

87.     Ms. Sherrod sent an email to HR at CBRE to alert them of their employee, Mr. Taylor, was sexually harassing and give them the opportunity to begin investigating.

88.     On November 18, 2022, Ms. Smith set a meeting with Ms. Sherrod for the first time to talk about Ms. Sherrod's role at the company.

89.     Wallbox was so chaotic at the time that this was the first time the two met to discuss Ms. Sherrod's role in depth.

90.     The meeting uneventful, Ms. Smith did not express any concern with Ms. Sherrod's work performance.

91.     On November 21, 2022, Ms. Yeldon complained again about Mr. McDonald being hostile toward her.

92.     Ms. Sherrod suggested terminating Mr. McDonald and Ms. Smith agreed.

93.     Wallbox fired Mr. McDonald.

94.     On November 28, 2022, HR went to a lunch with a new team member, Natalia Skaggs, on her first day.

95.     While at lunch, Ms. Smith and Abigail Martinez talked about an anonymous employee survey.

96.     Ms. Smith and Ms. Martinez were going through the survey, identifying who said what on the survey.

97.     Ms. Smith and Ms. Martinez said they could identify the comments made by Ms. Sherrod and quoted them verbatim, in a joking manner.

98.     Ms. Sherrod expressed concerns about the lack of anonymity.

99.    Later that same day, Ms. Smith walked up to Ms. Sherrod, who was sitting down, unprovoked, and began to yell at Ms. Sherrod that she was not working, and that Ms. Martinez was doing her work.

100.    This occurred in an open area.

101.    Ms. Smith was in Ms. Sherrod's personal space, yelling.

102.    Ms. Sherrod responded calmly, asking Ms. Smith to please get out of her personal space and not raise her voice at her.

103.    Everyone in the area grew quiet and watched the interaction.

104.    When Ms. Smith noticed others were watching, she sat down to have the conversation.

105.    They talked about the employment policies.

106.    Ms. Sherrod stayed late and wrote a set of basic policies and sent them to her that day.

107.    On December 2, 2022, Ms. Smith requested to meet with Ms. Sherrod one-on-one to talk about what happened that day.

108.    Ms. Sherrod stated that her behavior was inappropriate and unwarranted, and that Ms. Sherrod had never been treated like that by her supervisor.

109.    When Ms. Sherrod started, she was told that she could work from home two to three days a week and the other days from Nuvodesk.

110.    All of this stopped, and Wallbox made Ms. Sherrod work in a loud open area.

111.    All of the other HR persons were allowed to work from home.

112.    None of the other HR colleagues were Black, other than Ms. Smith, who is biracial.

113.    Ms. Smith thanked Ms. Sherrod for her feedback.

114.    On December 3, 2022, Ms. Smith emailed Ms. Sherrod a recap of their one-on-one meeting from the day before.

115.    Ms. Smith's description of the meeting did not correspond to the actual topics discussed.

116.    Ms. Smith's email added many negative topics about Ms. Sherrod and was framed as if Ms. Smith discussed these topics with Ms. Sherrod.

117.    The email excluded all constructive criticism Ms. Sherrod supplied to Ms. Smith.

118.    Ms. Sherrod responded the following Monday, December 5, 2022, that she needed time to review the email and provide her feedback.

119.    On December 5, 2022, Ms. Smith asks Ms. Sherrod for a draft of the non-exempt policy handbook.

120.    Drafting this kind of handbook takes time and is individualized to each company.

121.    Ms. Smith requested this draft immediately, which would not be possible.

122.    Ms. Sherrod worked late to make a small handbook and explained she tried her best to make quality work despite the time frame.

123.    Ms. Smith commended her on her policies by email.

124.    On December 7, 2022, Ms. Sherrod was working late to catch up on projects.

125.    Ms. Smith begins to message Ms. Sherrod on Slack about various tasks.

126.    Ms. Sherrod informs Ms. Smith that since she is working late, she would be in the office around 11 am.

127.    Ms. Smith asks Ms. Sherrod who will cover the factory, adding "I guess Abby will be covering for you again at the factory."

128.    Ms. Sherrod agrees to come in at the normal time, 9 am, so as not to cause an inconvenience.

129.    Ms. Smith copied Ms. Sherrod's Slack message and emailed it to Ms. Sherrod to "document" Ms. Sherrod's opinion.

130.    Ms. Sherrod asked why she was doing this, since she never had before.

131.    Ms. Smith messaged Ms. Sherrod on Slack until one in the morning.

132.    After Ms. Sherrod asked Ms. Smith about "documenting" Ms. Sherrod's Slack message, Ms. Sherrod noticed Ms. Smith and Ms. Martinez cancelling meetings and events off Ms. Sherrod's calendar without any advanced notice.

133.    Ms. Smith and Ms. Martinez exclusion of Ms. Sherrod from these meetings made her confused about tasks and omitted from projects updates.

134.    Following Ms. Sherrod's complaint to Ms. Smith about documenting slack messages, Ms. Smith tells Ms. Sherrod conflicting plans to investigate the complaint.

135.    First Ms. Smith tells her she will be investigating her own complaint against her.

136.    Then, Ms. Smith tells Ms. Sherrod she will have an external investigator verify whether Ms. Smith yells at people and is hostile.

137.    Ms. Smith conducts her own investigation into Ms. Sherrod's complaint against Ms. Smith.

138.    Ms. Smith began contacting Ms. Sherrod's colleagues.

139.    Ms. Smith contacted colleague Tasha Jackson.

140.    Ms. Jackson contacted Ms. Sherrod out of concern and to tell her the nature of the call.

141.    Ms. Jackson said Ms. Smith, in a threatening manner, told Ms. Jackson that Ms. Smith was aware Ms. Sherrod was complaining about her.

142.    Another witness told Ms. Sherrod that Ms. Smith told the witness at the front desk not to repeat things Ms. Smith said to Ms. Sherrod.

143.    On December 7, 2022, Ms. Sherrod emailed Mr. Flynn requesting to sit in a different area and complained about Ms. Smith's behavior.

144.    Mr. Flynn scolded Ms. Sherrod saying it would not be good for her, without addressing her complaints about Ms. Smith.

145.    On December 8, 2022, Ms. Sherrod meets with Mr. Flynn to discuss her complaint.

146.    Ms. Sherrod shared concerns that Mr. Flynn immediately sided with Ms. Smith without hearing Ms. Sherrod's story and that he was not acting without bias as he had a prior working relationship and friendship with Ms. Smith.

147.    Ms. Sherrod was also concerned that Mr. Flynn shared her complaint with Ms. Smith without consulting Ms. Sherrod, since Ms. Smith was behaving erratically, removing Ms. Sherrod from meetings, and being unprofessional.

148.    Mr. Flynn remained silent and did not deny he told Ms. Smith about Ms. Sherrod's complaint.

149.    On December 9, 2022, Ms. Smith retaliated against Ms. Sherrod by denying Ms. Sherrod's proper requests paid time off (PTO).

150.    Ms. Smith requested Ms. Sherrod submit her PTO when she asked everyone on the team for their PTO requests.

151.    Ms. Smith explained to Ms. Sherrod that she would have to wait until Ms. Martinez submitted her requests since she had not yet taken her PTO.

152.    This was unfair to Ms. Sherrod.

153.    Ms. Martinez had more flexibility to work from home than Ms. Sherrod and is friends with Ms. Smith from their previous employment.

154.    Ms. Smith started to delete messages denying Ms. Sherrod's PTO and attempting to replace them with re-worded messages via Slack.

155.    Ms. Sherrod reported Ms. Smith's deletion of Slack messages.

156.    Ms. Jackson informs Ms. Sherrod that Ms. Smith is calling colleagues at Nuvodesk into a private conference room for one-on-one conversations about Ms. Sherrod's complaint.

157.    In her conversation with Ms. Jackson, Ms. Smith asked her if Ms. Smith had yelled at Ms. Sherrod and if Ms. Smith's behavior was inappropriate.

158.    Ms. Jackson stated she disagreed with Ms. Smith's aggressive tone and hostile behavior.

159.    Ms. Jackson also reminded Ms. Smith of her hostility toward Ms. Jackson during her first week of employment.

160.    Ms. Jackson complained to her superiors about Ms. Smith's behavior and requested to work from Nuvodesk due to the same reasons as Ms. Sherrod: Ms. Smith's behavior and the noisy distracting environment on the floor.

161.    Ms. Jackson's request was granted.

162.    On December 9, 2022, Ms. Sherrod made a formal complaint about Ms. Smith to Mr. Doug Alfaro, General Manager, North America .

163.    In the following days, Ms. Smith continues to cancel meetings with Ms. Sherrod and rescheduling them to exclude Ms. Sherrod.

164.    Ms. Sherrod reports this to Sonia Cid, Head of Compliance on December 12, 2022.

165.    On December 15, 2022, Ms. Sherrod contacts Mr. Alfaro inquiring who would be approving her PTO requests.

166.    At this point, Ms. Smith had cancelled all of Ms. Sherrod's meetings and events from her calendar and was not approving any of Ms. Sherrod's PTO.

167.    Shortly after contacting Mr. Alfaro, Ms. Martinez approves Ms. Sherrod's PTO.

168.    Ms. Sherrod was confused by this as Ms. Martinez was included in her complaint against Ms. Smith.

169.    Ms. Martinez starts telling Ms. Sherrod she will complete a task and then not do so, causing Ms. Sherrod to receive backlash.

170.    On December 19, 2022, Ms. Martinez did not complete a task she told Ms. Sherrod she would take care of, and Ms. Sherrod was accused of not doing her job.

171.    On December 22, 2022, Ms. Sherrod was conducting orientation for new hire Antonio Banks when Ms. Martinez came into the room, took Mr. Banks' identification, and stated she would use it to process new employee paperwork like I-9s.

172.    Ms. Martinez, however, did not do it, again creating problems for Ms. Sherrod.

173.    On December 26, 2022, Ms. Sherrod learned Ms. Smith did not process Ms. Sherrod's own I-9 form because she did not know how to do it.

174.    The form had to be resubmitted to Patrick Yeldon .

175.    Following Ms. Sherrod's complaint against Ms. Smith, Wallbox assigned employees a Code of Ethics training to be completed using TriNet and required employee signature at completion.

176.    Ms. Sherrod completed her training on December 27, 2022.

177.    On January 10, 2023, Ms. Sherrod had her first meeting with an investigator regarding her complaint against Ms. Smith.

178.    The investigator was Elisabeth Fernandez, an attorney from Barcelona in the Wallbox Labor and Compliance department.

179.    On January 11, 2023, Ms. Sherrod received an email from Jeanna Hearring about a background check on an employee.

180.    Ms. Hearring told Ms. Sherrod the employee had not completed a background check and the task had lapsed in the background check system called Checkr.

181.    Ms. Martinez had told Ms. Sherrod on December 22, 2022, she would handle this employee's background check.

182.    Ms. Martinez did not complete it.

183.    Ms. Martinez put Ms. Sherrod in a difficult position by intervening and stating she would handle a task originally intended for Ms. Sherrod to complete and then abandon it.

184.    Ms. Sherrod oversaw plant recruiting, onboarding, I-9s, and background checks, employee relations, and Ms. Martinez was supposed to assist all her colleagues as a backup on their projects.

185.    When Ms. Martinez assisted Ms. Sherrod with her project, Ms. Smith would accuse Ms. Sherrod of having Ms. Martinez do her job.

186.    Ms. Martinez faced no repercussions for not completing tasks she volunteered to take.

187.    On January 11, 2023, a colleague, Sharmone Johnson approached Ms. Sherrod to make a complaint about Ms. Smith.

188.    Ms. Johnson reported Ms. Smith intimidated her and that Ms. Johnson's complaints about Ms. Smith were not being taken seriously or investigated properly.

189.    On February 8, 2023, Ms. Sherrod emailed Ms. Fernandez to follow up regarding the investigation.

190.    Ms. Fernandez responded via email and provided a statement of her findings, stating there were none.

191.    Ms. Sherrod advised Ms. Fernandez that the report was inaccurate, and that amongst other errors, Ms. Sherrod's own name was misspelled in the investigation report.

192.    Ms. Sherrod advised Ms. Fernandez that she disagreed with the report, the manner in which the investigation was conducted, and to refer to her initial complaint statement.

193.    Around March 2023, following the completion of the investigation, Ms. Sherrod and Ms. Smith met to discuss the issues.

194.    Ms. Smith agreed that she yelled, was hostile, and that she was having personal issues.

195.    Ms. Smith asked Ms. Sherrod about bringing the team back together following the investigation, and Ms. Sherrod suggested a team outing.

196.    On April 7, 2023, the People and Talent team had an outing, only other persons outside of Ms. Smith's immediate team were invited, including Ms. Yeldon, Ms. Johnson, and Ms. Allen.

197.    On April 21, 2024, Ms. Johnson approached Ms. Sherrod to terminate Mr. Tom Quinones for a safety violation.

198.    Ms. Sherrod and Ms. Johnson met for hours to review the documentation.

199.    Ms. Sherrod and Ms. Johnson met with Ms. Smith and Mr. Flynn about the incident.

200.    Ms. Smith agreed that Mr. Quinones should be terminated and to proceed with the termination process.

201.    Ms. Sherrod contacted Mr. Flynn and Mr. Craft to be present for the meeting.

202.    Prior to the start of the meeting, Ms. Johnson, who requested to terminate Mr. Quinones, immediately left the room after receiving a call from Ms. Smith as Mr. Quinones entered the room.

203.    Ms. Johnson exiting the room right as Mr. Quinones arrived caused him to become irate.

204.    Ms. Sherrod then had to proceed with Mr. Quinones' termination for the Safety department.

205.    Mr. Quinones was shaking, irate, and he had his tools with him during the meeting.

206.    Ms. Sherrod felt she was in danger, as Mr. Quinones had said he had PTSD and that the situation was very triggering for him when Ms. Johnson ran out of the room upon his entry.

207.    Ms. Sherrod was able to get Mr. Quinones to exit the building without issue.

208.    Following, Ms. Sherrod advised Mr. Flynn that the actions of Ms. Johnson and Ms. Smith could have made the situation to be very dangerous and placed the lives of those in the room at risk.

209.    Mr. Flynn disregarded Ms. Sherrod's concerns.

210.    On April 21, 2023, Ms. Smith called Ms. Sherrod to apologize regarding the way she handled Mr. Quinones' termination.

211.    On April 24, 2023, Ms. Sherrod arrived at work and Ms. Johnson and Ms. Smith were in the office.

212.    Ms. Smith was rarely in the office before Ms. Sherrod.

213.    Immediately, Ms. Smith advised Ms. Sherrod in front of her colleagues that she wanted to speak to her in the conference room immediately.

214.    Ms. Smith proceeded to the conference room and scolded Ms. Sherrod about Mr. Quinones' termination after apologizing the prior Friday.

215.    After this conversation, Ms. Sherrod requested to work the remainder of the week from home.

216.    On April 26, 2023, Lorelei Lozano, Stride Staffing, came to the plant to speak to Ms. Sherrod.

217.    Ms. Lozano was aware Ms. Sherrod would be out of the office.

218.    Ms. Cutler, the receptionist, told Ms. Lozano that she would contact another People and Talent representative after calling Ms. Sherrod by phone.

219.    Ms. Sherrod remained on the phone to direct the staff person to provide Ms. Lozano with the equipment to meet with staff members.

220.    Ms. Martinez spoke to Ms. Lozano and asked Ms. Lozano if there was an issue.

221.    Ms. Lozano proceeded to tell Ms. Martinez that Ms. Sherrod had previously hired and when he** came to work for his first day, Ms. Sherrod advised him to leave.

222.    Ms. Cutler stated that Ms. Martinez tried to keep her from hearing the conversation, although she could.

223.    Ms. Cutler advised Ms. Sherrod of the conversation and Ms. Sherrod contacted Ms. Martinez phone to provide the correct information.

224.    Ms. Martinez did not answer her phone.

225.    Ms. Sherrod called Ms. Smith.

226.    Ms. Smith did it answer.

227.    Ms. Smith called Ms. Sherrod back and placed her on speaker phone and loudly told Ms. Sherrod she did not like how Ms. Sherrod handled the new hire situation.

228.    Ms. Sherrod tried to tell Ms. Smith that she had an email to prove that she followed the proper procedure and emailed the staffing firm the week prior to the new hire's start date to relay the date change.

229.    Ms. Sherrod also told Ms. Smith that she could hear Ms. Martinez in the front office asking Ms. Lozano had she had issues with Ms. Sherrod in the past.

230.    The start date was changed by Curt Landers, Supply Chain Director.

231.    Ms. Smith continued to be disrespectful, defend Ms. Martinez, and was loud until Ms. Sherrod noticed that she could hear voices in the background.

232.    Ms. Sherrod asked Ms. Smith if she was on speaker phone and if others could hear.

233.    Ms. Smith was delayed in her response, then defended why she had her on the speaker phone saying she was sick of Ms. Sherrod questioning her and that she just placed Ms. Sherrod on speaker phone by coincidence.

234.    Ms. Sherrod heard Ms. Martinez in the background saying she did not think it was right that Ms. Cutler had Ms. Sherrod on the phone in the front office.

235.    Ms. Smith had not spoken on speakerphone in past conversations in the open office.

236.    Ms. Sherrod reported the incident to Mr. Flynn with little to no response.

237.    Upon her return to the office the following week, all People and Talent staff, Ms. Jackson, and Ms. Johnson, were absent from the plant office without any notice to Ms. Sherrod.

238.    Ms. Sherrod was the only People and Talent employee working in the office for the entire week without any communication from the team.

239.    On May 4, 2023, Ms. Sherrod followed up with Mr. Flynn regarding her complaint against Ms. Smith and Mr. Flynn said that the Compliance department would be in touch with her by May 5, 2023.

240.    On May 5, 2023, shortly after arriving to work for a Cinco de Mayo event, Ms. Martinez told Ms. Sherrod that if she did not get food immediately, the food truck would be leaving.

241.    Ms. Sherrod went to get food from the food truck.

242.    After arriving back to the office a few minutes later, the entire office staff had cleared the room and Ms. Flynn and Mr. Landers came into the office and handed Ms. Sherrod a termination letter, saying she was terminated immediately.

243.    Ms. Sherrod had never received a verbal or written warning, only complained about Ms. Smith.

## V.    CAUSES OF ACTION (Section 1981) – Discrimination, Retaliation, and Hostile Work Environment

I.    Paragraphs one through 243 of this complaint are incorporated by reference and made a part of Causes of Action.

II.    Plaintiff alleges that Defendant has discriminated and retaliated against her by treating her differently from and less preferably than similarly situated non-African American employees and subjecting her to discriminatory denials of promotions, discriminatory denials of pay raises, discriminatory performance evaluations, discriminatory subjection to disciplinary procedures, disparate terms and conditions of employment, harassment, hostile work environments, termination, and other forms of discrimination in violation of Section 1981.

III.    Plaintiff alleges that Defendant retaliated against her for reporting and opposing race discrimination.

IV.    Defendant's conduct has been disparate, intentional, deliberate, willful and conducted in callous disregard of the rights of Plaintiff and others.

V.    Defendant's policies and practices have produced a disparate impact against Plaintiff with respect to the terms and conditions of employment that are based upon, result from, and are caused by intentional discrimination.

VI.    By reason of the continuous nature of Defendant's discriminatory conduct, persistent throughout the employment of Plaintiff, Plaintiff is entitled to application of the continuing violation doctrine to all of the violations alleged herein.

VII.    Because of the discrimination suffered at Defendant, Plaintiff is entitled to all legal and equitable remedies available under Section 1981.

VIII.    Plaintiff may be entitled to damages for retaliation and injunctive relief.

## JURY DEMAND

IX.    Plaintiff requests a trial by jury to the extent allowed by law.

WHEREFORE, Plaintiff requests the following relief:

A. Declaratory judgment that Defendant's employment policies, practices and procedures challenged herein are illegal and in violation of Section 1981;

B. A permanent injunction against Defendant and their partners, officers, owners, agents, successors, employees and representatives and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and race discrimination and retaliation by the Defendants as set forth herein;

C. An Order requiring Defendant to initiate and implement programs that (i) will provide equal employment opportunities for African American employees; (ii) will remedy the effects of the Defendant's past and present unlawful employment policies, practices or procedures; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described.

D. An Order requiring the Defendant to initiate and implement systems of assigning, training, transferring, compensating, and promoting African American employees in a non-discriminatory manner;

E. An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (A) through (D) above, which would provide for (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance

that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (A) through (D), above;

F. An Order placing or restoring Plaintiff into the job she would now be occupying, but for Defendant's discriminatory and retaliatory policies, practices or procedures;

G. An Order directing Defendant to adjust the wage rates and benefits for Plaintiff to the level that they would be enjoying but for the Defendant's discriminatory and retaliatory policies, practices and procedures;

H. An award of back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits suffered by the Plaintiff to be determined at trial.

I. Any other appropriate equitable relief to Plaintiff;

J. An award of compensatory, nominal and punitive damages to Plaintiff;

K. An award of litigation costs and expenses, including reasonable attorneys' fees, to the Plaintiff;

L. Pre-judgment interest;

M. Such other and further relief as the Court may deem just and proper; and

N. Retention of jurisdiction by the Court until such time as the Court is satisfied that the Defendant has remedied the practices complained of herein and are determined to be in full compliance with the law.

Respectfully submitted,

*/s/ Brian Sanford*

    Brian Sanford
    Texas Bar No. 17630700
    bsanford@sanfordfirm.com
    Elizabeth "BB" Sanford
    Texas Bar No. 24100618
    esanford@sanfordfirm.com
    Karla Connell
    Texas Bar No. 24138013
    kconnell@sanfordfirm.com

**THE SANFORD FIRM**
1910 Pacific Ave., Suite 15400
Dallas, TX 75201
Ph:  (214) 717-6653
Fax: (214) 919-0113

**ATTORNEYS FOR PLAINTIFF
CONEISHA SHERROD**